UNITED STATES DISTRICT COURT      <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK

PETER T. NICHIK,

                     Plaintiff,

- versus –

NEW YORK CITY TRANSIT AUTHORITY
a/k/a MTA NEW YORK CITY TRANSIT,
HOWARD H. ROBERTS, JR., THOMAS F.
PRENDERGAST, BRENDA SIDBERRY,
VIVIAN CAMPBELL, HENRY CABAN,
GRICELDA CESPEDES, DAVID SIERRA,
DEMETRIUS CRICHLOW, JAVIER ROCHA
and PHYLLIS BOOKER, individually and in
their official capacities,

                     Defendants.

MEMORANDUM
<u>OF DECISION</u>
10-CV-5260 (JG)

A P P E A R A N C E S:

BEDLOCK LEVINE & HOFFMAN LLP
99 Park Avenue, Suite 1600
New York, New York 10016
By:    Jenn Rolnick Borchetta
        *(Former) Attorneys for Plaintiff*

HOGUET NEWMAN REGAL & KENNEY LLP
10 East 40th Street
New York, New York 10016
By:    Sarah Logue
        *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

Peter Nichik, a New York City Transit Authority ("NYCTA") superintendent,

brings this retaliation action against the NYCTA and nine of its present and former employees.

Nichik alleges that he was retaliated against by defendants for reporting unsafe conditions related

to gates in New York City subway stations in August 2007.  Nichik contends that defendants'

conduct violated: (1) the National Transit Systems Security Act ("NTSSA"), *see* 6 U.S.C. § 1142; (2) the Due Process Clause of the Fourteenth Amendment to the United States Constitution; (3) the right to due process under the New York State Constitution; (4) the First Amendment to the United States Constitution; (5) the right to free speech under the New York State Constitution; (6) the New York Civil Service Law § 75-b; (7) the Family and Medical Leave Act ("FMLA"), *see* 29 U.S.C. §§2601 *et seq.*; and (8) New York common law prohibiting the intentional infliction of emotional distress.

Defendants have moved for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.  For the reasons stated below, the defendants' motion is denied in part and granted in part.  Specifically, summary judgment is denied with regard to the NTSSA and free speech claims, and granted with regard to the remaining claims.

## BACKGROUND

Nichik has been employed by NYCTA for over 25 years.  He became a NYCTA superintendent in 1991.  Def. 56.1 ¶ 25, Pl. 56.1 ¶ 25.  As a superintendent, Nichik was a managerial employee with supervisory authority over union employees, and he was charged with the responsibility of maintaining a safe and clean environment for customers in the subway stations assigned to him.  Def. 56.1 ¶ 3, Pl. 56.1 ¶ 3.  In 2007, Nichik was transferred to work in a Brooklyn district of NYCTA headed by defendant David Sierra.   In this position, Nichik reported to defendant Henry Caban, who was a Zone Superintendent within Sierra's district. Def. 56.1 ¶ 38, Pl. 56.1 ¶ 38.

A. *Nichik Learns of Hazardous Safety and Security Conditions Involving Subway Gates*

In the summer of 2007, Nichik was assigned to Stations Sector 18, District 3, and was responsible for managing certain subway stations along Eastern Parkway in Brooklyn.  Over

Labor Day weekend the West Indian Day Parade runs along Eastern Parkway. Pl. 56.1 ¶ 43. Nichik was assigned to help prepare for the parade, which included ensuring that gates in his stations were properly secured.   Def. 56.1 ¶¶ 43, 44, Pl. 56.1 ¶¶ 43, 44.   Stations in the New York City subway system contain various types of gates that regulate pedestrian traffic.  Pl. 56.1 ¶ 45.  Some stations have gates (either at the base of station stairs or abutting subway turnstiles) that will barricade subway entrances and exits if they are closed.  *Id*.  When they are open, these gates should be locked into position.  *Id*.  An unlocked security gate at a subway entrance is a risk because it makes it possible for someone to close and lock the gate, preventing passengers from leaving the station.  *Id*.

During Nichik's inspection of his assigned subway stations he observed numerous unsecured gates, including gates missing locks and chains, and security gates bearing broken or ineffective locks.  Nichik Decl. ¶¶ 13-15.  Nichik contacted Scott Pleasants, the Director of Material Control, to obtain locks and chains to secure the gates.  Nichik Decl. ¶ 16.  Nichik later received locks from Caban.  Nichik Decl. ¶ 21.  He also contacted the NYCTA's Director of Fire Safety & Risk Assessment, Kenneth Brown, to confirm that NYCTA policy required open gates to be locked in the open position, and that a failure to do so is a safety and security hazard.  Pl. 56.1 ¶ 52; Def. 56.1 ¶ 52.

B.  *Nichik Reports Unsafe Gates to NYCTA President Roberts in August/September 2007*

On August 30, 2007, Nichik emailed Howard H. Roberts Jr., the NYCTA's then-president.  He identified himself as a stations superintendent and reported the unreliability and failures of locks on the subway security gates.  Nichik Decl. Ex. 1.  He explained the requirement that security gates be locked in position (whether closed or open) and expressed his concern that unlocked gates in the subway station may be a widespread condition.  He also gave

3

examples of how the unlocked gates could lead to injuries or even fatalities.   Roberts forwarded

Nichik's email to an assistant with instructions to discuss with Brown the issue raised by Nichik.

Nichik Decl. Ex. 1, Roberts Dep. 37:2-13.  Brown reported that "while some stairs do not have

gates, the stairs that do have gates overwhelmingly are not properly secured in the open

position."  Borchetta Decl. Ex. 6.  Nichik's email prompted a system-wide survey.

Once the system-wide survey was underway, Nichik checked the subway gates

and locks at the station at 42nd Street and Eighth Avenue in Manhattan, near the District 3 Field

Office of the NYCTA at the Port Authority Terminal.   Nichik Decl. ¶ 31.   He found

discrepancies between the condition of the subway gates and locks as reported and the actual

field conditions, and he took photographs to demonstrate the discrepancies.  *Id.* ¶¶ 31-32.  Nichik

emailed Roberts regarding this problem and included the photographs of the gates at the Port

Authority station.  *Id.* ¶ 34.

C.    *Nichik Receives Reinstructions, an Unfavorable Review and a Disciplinary*

In the six months following his report to Roberts, Nichik received reinstructions

(a written reminder to an employee to conform his actions to NYCTA requirements), "Marginal"

Managerial Performance Reviews ("MPR"), and Disciplinary Action Notifications ("DAN").

In October and November 2007, Nichik was "reinstructed" for failing to (1)

follow the chain of command; (2) be in his assigned area; (3) provide visibility coverage; and (4)

perform inspections.   Borchetta Decl. Exs. 23-25, 27. He received a formal write-up on

November 12, 2007 for "destruction of NYC Transit Property."  Borchetta Decl. Ex. 26.

In March 2008, Nichik was given his MPR for the review period of January to

December 2007.  He received an overall rating of "Marginal."   Am. Compl. ¶ 58; Logue Decl.

Ex. II.  In the "Summary Comments" section, Caban noted that Nichik "[r]eceived a marginal

rating for failing to complete employee performance observations in his area of responsibility in a timely manner." Logue Decl. Ex. II. Attached to the MPR was Caban's memorandum regarding Nichik's rating. He stated that Nichik failed to (1) work well with supervisors; (2) complete investigations and monthly reports in a timely manner; (3) supply surveys in a timely manner; (4) organize and plan his stations for the West Indian Day Parade; and (5) to effectively communicate with his peers, supervisors and hourly employees. *Id.*

On March 12, 2008, Nichik received a formal disciplinary action notification ("DAN"). Borchetta Decl. Ex. 30. Nichik was charged with four specifications regarding: (1) dislodging a loose bench; (2) failing to respond to a passenger death in a timely manner; (3) failing to work his regular day off during a fare change, as ordered; and (4) failing to stay on duty after his tour due to a fare change[1]. *Id.* The recommended penalty was demotion to Supervisor Stations Level II with the appropriate reduction in salary; Nichik appealed and the penalty was modified to a suspension.

Nichik received four DANs in 2010. He is still employed at NYCTA.

DISCUSSION

A. *The Summary Judgment Standard*

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). All facts must be viewed in the light

---

[1] Specification four was modified in light of records indicating that Nichik remained on duty, but failed to go to the station he was assigned to. This charge was amended to read "Improper Performance of Duty." Logue Decl. Ex. KKK.

most favorable to the non-moving party, and all inferences must be drawn in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Liberty Lobby, Inc.*, 477 U.S. at 250.  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005).  Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(c)).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.* at 586.  There must be sufficient evidence upon which a reasonable fact finder could return a verdict for the non-moving party.  *Liberty Lobby, Inc.*, 477 U.S. at 248–49; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

   B.  *Retaliation Claims*

      1.  *Whistleblower Claims (First and Sixth Causes of Action)*

Nichik alleges he was retaliated against by defendants in violation of the National Transportation Systems Security Act of 2007 ("NTSSA"), 6 U.S.C. § 1142. [2]  Under NTSSA, a public transportation agency may not retaliate against a public employee "in whole or in part" because of the employee's report of hazardous safety and security conditions.  § 1142(b)(1)(A).  The prohibition against retaliation extends to discharge, demotion, suspension, reprimand, intimidation, threats, restraints, coercion, blacklisting, or discipline, if the report of hazardous safety and security conditions contributed in any way to that action.  § 1142(b)(1); *see also* 29 C.F.R. 1982.102.

---

[2]      There is little case law regarding the NTSSA,  but the parties agree that I can look to other whistleblower statutes for guidance, including the one in the Sarbanes-Oxley Act, 18 U.S.C.A. § 1514A(b)(2)(C).

Nichik bears the initial burden of making a prima facie showing of retaliation by demonstrating that: (1) he engaged in protected activity, (2) the employer knew of the protected activity, (3) he suffered an unfavorable personnel action, and (4) the circumstances to suggest that the protected activity was a contributing factor to the unfavorable action. *Fraser v. Fiduciary Trust Co., Int'l*, 417 F.Supp. 2d 310, 322 (S.D.N.Y. 2006); *see also Gattegno v. Admin. Review Bd.*, 353 F. App'x 498, 499–500 (2d Cir. 2009) (same). Even if a prima facie showing is made, the claim will be dismissed if the employer demonstrates, by clear and convincing evidence, that it "would have taken the same unfavorable personnel action in the absence of" the protected activity. §§ 1142(c)(2)(B)(ii), (iv).

   a.  *Protected Activity*

The NTSSA protects transportation employees who make reports regarding the hazardous safety or security conditions on the public transportation system. § 1142(b)(1)(A).

The defendants' brief is silent as to whether Nichik engaged in protected activity within the meaning of the NTSSA. In August and September 2007 Nichik emailed Roberts regarding unsafe subway conditions. In his report, Nichik explained that the gates are required to be secured (whether in the closed or open position), and that the failure to secure them could lead to injuries or fatalities. He expressed his concern that this problem may be system-wide. Nichik also provided Roberts with photographs depicting discrepancies between the reported conditions of the gates and their actual conditions. Nichik's reports to Roberts are sufficient to support a jury finding that he engaged in protected activity under the NTSSA.

   b.  *Adverse Personnel Action*

An adverse action under the NTSSA is any "unfavorable personnel action," which includes, discipline, demotion, threats and reprimand. § 1982.012. To establish that he suffered

an adverse action, the plaintiff must "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe R.R. Co.*, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted).

Defendants concede that Nichik received a Disciplinary Action Notification in March 2008, an adverse personnel action. Defs.' Mem. of Law at 20. However, they argue that the various other acts Nichik labels as adverse, such as reinstructions, do not constitute adverse personnel actions. Nichik alleges that he was subject to "six formal disciplinary actions; five disciplinary reinstructions and threats of additional discipline; 'Marginal' ratings on MPRs; loss of pay increases; two suspensions without pay; demotion from the managerial title he held for more than a decade; reduction of salary; denial of promotional opportunities; unfavorable work assignments; and forced uncompensated work," all of which constitute adverse employment actions. Pl.'s Mem. of Law at 26.

A reasonable juror could disagree with defendants and find that personnel actions taken against Nichik were adverse. In the two months following his report to Roberts he received six reinstructions and a citation. Borchetta Ex. 28. These reinstructions were placed in his personnel file and relied upon by Labor Relations in making determinations about his future discipline. They were also used in Nichik's "Marginal" 2007 MPR, which in turn resulted in Nichik not receiving a raise. Lodge Dep. 49:4-14. Further, Campbell stated that a reinstruction can be a form of discipline. Campbell Dep. 122:15-17. In the context of the expressed displeasure towards Nichik, discussed *infra*, a reasonable jury could conclude that these actions could dissuade a reasonable NYCTA worker from reporting a hazardous safety or security condition.

       *c.   Causal Nexus*[3]

       Nichik must demonstrate a causal connection between his protected activity and adverse actions the defendants took against him. *Isaac v. City of N.Y.*, 701 F. Supp. 2d 477, 496 (S.D.N.Y. 2010) (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d. Cir. 1999)).   The NTSSA requires Nichik to demonstrate this causal connection by showing, by a preponderance of the evidence, that the protected activity was a "contributing factor in the unfavorable personnel action" taken against him.  § 1142(c)(2)(B)(i).

       Defendants contend that Nichik cannot show this causal connection because there is a lack of temporal proximity between the protected activity and the unfavorable personnel action.   Specifically, they argue that Nichik reported the security gates in August and early September 2007, and it was a full six months before the March 2008 DAN was issued.

       As discussed above, I do not view the adverse employment actions so narrowly. A reasonable juror could conclude that the reinstructions that occurred beginning a month after Nichik's report demonstrate a close temporal proximity to Nichik's protected conduct. Furthermore, apart from such proximity, there is other direct and circumstantial evidence of retaliatory animus that supports a causal connection.

       First, the record contains evidence that defendants openly displayed animus towards Nichik because of his report to Roberts regarding the gates.   For example, Brenda Sidberry, the Chief Station Officer, stated that she "wasn't pleased" to learn of Nichik's report to Roberts (Sidberry Dep 144:12-19) and was "annoyed because [the complaint] was on the president's level" (*Id.* 145:10-13).   David Sierra, General Superintendent, also told Nichik's direct supervisor, Henry Caban, "if this gates thing gets out you're fucked."  Nichik Decl. ¶ 22.

---

[3]       The parties do not dispute that defendants were aware of the allegedly protected conduct.

Vivian Campbell, the Assistant Chief Stations Officer, does not deny saying that she informed Nichik that his gates report was the reason for one of his October 2007 reinstructions.  Campbell Dep. 216:22-217:20.

In addition, there is circumstantial evidence apart from the temporal proximity from which the jury could infer that the defendants subjected Nichik to adverse personnel actions because of retaliatory animus towards him.  The Supreme Court has made it clear that "context matters" in assessing whether an employer's acts were materially adverse.  *Burlington*, 548 U.S. at 69.  "Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011).

Viewed in context, a jury could conclude that NYCTA's treatment of Nichik after his August 2007 report to Roberts was motivated at least in part by the fact that he made the report.  In the six years prior to his report, Nichik received an overall "Good" rating on each of his yearly managerial performance reviews.  Logue Decl. Exs. BB - HH.  The six-month MPR immediately preceding his report stated that "Nichik is a good superintendent with a great amount of knowledge, experience and expertise in Station Department policies and procedures that could serve as a positive asset to District #3, when skills are used to benefit the Transit system."  Logue Decl. Ex. UU.  In the yearlong 2006 MPR immediately prior to his report, Nichik received a "Good" rating on 100% of the skill categories under review (Logue Decl. Ex HH); in the yearlong review after his reports, his received a "Good" rating on only 38% of the skill categories (Logue Decl. Ex II).  In the eight months preceding his report, Nichik only received two reinstructions.  Logue Decl. Ex. UU.  However, beginning a month after his report, Nichik began to receive numerous reinstructions and write ups.  A jury could reasonably find

that defendants had animus towards Nichik because of his gates reports, which led to the adverse actions he suffered.  While defendants provide explanations for the reinstructions and DANs, pointing to Nichik's "insubordination and misconduct," Defs.' Mem. of Law at 18, those arguments are  more appropriately addressed to a jury.

In sum, based on all the evidence in the record, and drawing all reasonable inferences in favor of Nichik, a jury could conclude that he suffered adverse personnel actions and that a retaliatory animus toward Nichik was a contributing factor in the adverse actions.

### d.  Defendants' Non-Retaliatory Defense

In a NTSSA action, an employer may defeat a prima facie case of retaliation at the summary judgment stage if it can show that no genuine issue of material fact exists that would preclude the conclusion, by clear and convincing evidence, that defendant "would have taken the same unfavorable personnel action in the absence of [the protected] behavior."  *See* § 1142(c)(2)(B)(iv).

Defendants argue that Nichik had a long record of poor and marginal performance as a superintendent, including submitting monthly reports late, failing to inspect his station, and failing to report to a station where a dead person was found in a restroom, despite being instructed to do so by his supervisor.  Defendants contend that Nichik's insubordination left them with no choice but to discipline and suspend him. Def. Mem. of Law at 24-25.  However, there is evidence that other employees in managerial positions would not have been disciplined for similar conduct.

For example, Sidberry testified that "not just any" infraction of the rules warranted discipline, but rather the infraction would have to be severe.  As examples of what constitutes a severe infraction, Sidberry noted "blatant insubordination, striking an employee or a

customer without being warranted." Sidberry Dep. 29:6-11. Sidberry stated that she would not consider late paperwork a serious infraction. *Id.* at 80:9-13. She could only recall two managers being dismissed and she believed one of them was dismissed for viewing pornography on his work computer. *Id.* at 300:1-25. For his part, Nichik asserts that in his 20 years as a manager, he has never heard of any "long term managerial employee being demoted or dismissed" for the kinds of infractions alleged against him. Nichik Dec. ¶ 66.

I cannot conclude as a matter of law on the record before me that the defendants have demonstrated by clear and convincing evidence that Nichik's infractions would have necessarily resulted in unfavorable employment actions independent of any retaliatory motive.

### 2. *Free Speech Retaliation Claims (Fourth and Fifth Causes of Action)*

Nichik alleges that defendants also violated the First Amendment and the New York Constitution[4] by retaliating against him for reporting the unsafe subway gates. The Second Circuit has "described the elements of a First Amendment retaliation claim in several ways, depending on the factual context." *Williams v. Town of Greenburgh,* 535 F.3d 71, 76 (2d Cir. 2008). Where, as here, a public employee brings a retaliation claim based on the First Amendment, a plaintiff must put forth evidence that demonstrates the following in order to establish a prima facie case: "(1) [he] engaged in constitutionally protected speech because [he] spoke as [a] citizen[ ] on a matter of public concern; (2) [he] suffered an adverse employment action; and (3) the speech was a motivating factor in the adverse employment decision." *Skehan v. Vill. of Mamaroneck,* 465 F.3d 96, 106 (2d Cir. 2006) (internal quotation marks and citation omitted), overruled on other grounds by *Appel v. Spiridon,* 531 F.3d 138, 140 (2d Cir. 2008).

### a. *The Protected Speech Issue*

---

[4]       The parties agree that claims of retaliation in violation of Article 1, section 8 of the New York State Constitution are subject to the same analysis as First Amendment claims, and can be disposed of on the same grounds. *See also Carter v. Inc. Vill of Ocean Beach*, 693 F.Supp.2d 203, 212 (E.D.N.Y. 2010).

*1.* Garcetti and Weintraub

The Supreme Court held in *Garcetti v. Ceballos,* 547 U.S. 410 (2006), that the First Amendment does not protect an employee from employer discipline where the speech at issue was made pursuant to the employee's official duties.  To determine whether or not a plaintiff's speech is protected, a court must begin by asking "whether the employee spoke as a citizen on a matter of public concern." *Garcetti*, 547 U.S. at 418.  This test contains two separate requirements: (1) that the employee speak as a citizen, and (2) that the employee speak on a matter of public concern.  If either of these requirements is not met, then a First Amendment retaliation fails as a matter of law. *See id.* (If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.")

In *Garcetti*, the plaintiff's speech was about misrepresentations made by police officers in an affidavit in support of a search warrant.  Because the plaintiff's job in the prosecutor's office was to evaluate such affidavits, the Court held that he "acted as a government employee" in engaging in the speech at issue.  *Id.* at 422.  "When a public employee speaks pursuant to employment responsibilities . . . there is no relevant analogue to speech by citizens who are not government employees." *Id.* at 424.

*Garcetti* balanced the interest protected by the First Amendment (the need to protect from retaliation by government employers unwelcome speech by their employees on matters of public concern) with the need to "afford[] government employers sufficient discretion to manage their operations." *Id.* at 422.  The holding created a risk that government employers might seek to suppress unwelcome speech by their employees on matters of public concern by the simple expedient of enlarging their job duties to require them to communicate to their

13

supervisors all issues regarding the administration of the workplace.  Justice Souter's dissent predicted such a result,[5] but in response the Court emphasized that the "practical" inquiry prescribed would prevent employers from "restrict[ing] employees' rights by creating excessively broad job descriptions"; no matter the formal job description, only speech "within the scope of the employee's professional duties" would fall within the Court's holding.  *Id.* at 424-25.

Though *Garcetti* was intended as a narrow exception to First Amendment protection, it has been interpreted broadly, curbing more speech than its rationale would require. In *Weintraub v. Bd. of Educ.*, 593 F.3d 196 (2d Cir. 2010), the Second Circuit held that a teacher's speech about his supervisor's failure to discipline a child (who was throwing books at the teacher) was pursuant to the teacher's official duties because speech related to maintaining classroom discipline was in furtherance of one of his core duties as a teacher.  *Weintraub*, 593 F.3d at 205.  This arguably expanded the *Garcetti* holding.  As mentioned, the majority in

---

[5]     Justice Souter wrote as follows:

> I do not say the value of speech "pursuant to . . . duties' will always be greater, because I am pessimistic enough to expect that one response to the Court's holding will be moves by government employers to expand stated job descriptions to include more official duties and so exclude even some currently protectable speech from First Amendment purview.  Now that the government can freely penalize the school personnel officer for criticizing the principal because speech on the subject falls within the personnel officer's job responsibilities, the government may well try to limit the English teacher's options by the simple expedient of defining teachers' job responsibilities expansively, investing them with a general obligation to ensure sound administration of the school.  Hence today's rule presents the regrettable prospect that protection under *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), may be diminished by expansive statements of employment duties.
> The majority's response, that the enquiry to determine duties is a "practical one," *ante,* at 1961, does not alleviate this concern. It sets out a standard that will not discourage government employers from setting duties expansively, but will engender litigation to decide which stated duties were actual and which were merely formal."

*Garcetti*, 547 U.S. at 431, fn. 2 (Souter, J. dissenting).

*Garcetti* had assured that just because a duty to speak appeared in a job description, that would not automatically entitle the employer to punish that speech without First Amendment consequences. But *Weintraub* held that an employer can punish speech even if it is "not required by, or included in," the job description as long as it was "part-and-parcel of [the employee's] concerns about his ability to properly execute his duties." *Weintraub*, 593 F.3d at 203 (internal quotation marks and citation omitted).

### 2. *Application of* Garcetti *to Nichik's Speech*

Nichik contends that his gates report to Roberts was not "part and parcel" of his "core" or "primary employment responsibilities," and therefore he was speaking as a citizen. Pl.'s Mem. of Law at 23. Specifically, Nichik informed Roberts of a system-wide gates condition and presented documented discrepancies between actual and recorded gates conditions in a subway station complex (at 42nd Street and Eighth Avenue) that was not under his purview and not part of his job duties. Further, though Nichik had never before contacted or communicated with Roberts, he reported the gates conditions to him. Defendants argue that Nichik made his reports about the security gates as a NYCTA superintendent and not as a citizen speaking on a matter of public concern. Defs.' Mem. of Law at 15. They point to the fact that Nichik was responsible for public safety, which included ensuring that security gates were locked and properly secured. Also, the unsecured gates came to his attention during part of his regular job duties and it would be contrary to his duties to ignore this problem. Defs.' Reply Br. 15.

Although I find the issue to be a close one, I conclude that, despite the expansive reading of *Garcetti* adopted in *Weintraub*, it cannot be said that Nichik's report to Roberts of safety conditions not in his designated area was, as a matter of law, in furtherance of his core

functions as a superintendent.  Factual issues remain regarding Nichik's official duties and the scope of those duties.  For example, even though Nichik had already received locks to secure his assigned stations, he contacted President Roberts concerning the unsecured security gates as a system-wide problem.  In his email to Roberts, Nichik explained that he contacted Roberts for "problem resolution" because he did not have confidence in the "current leadership."  *Id*.  Prior to this email, Nichik had never communicated with Roberts or reported safety concerns to him.  Nichik Decl. ¶¶ 28-29.  After Nichik's report to Roberts, a system-wide survey of the subway gates began.  Nichik Decl.  ¶¶34-35.

These facts undermine defendants' efforts to characterize Nichik's reports to Roberts as speech made pursuant to Nichik's job responsibilities.  Though I will revisit the issue at the conclusion of the plaintiff's case at trial, I decline to hold at this time, as a matter of law, that reasonable jurors would be required to find that Nichik's speech was unprotected pursuant to the principles established by *Garcetti* and *Weintraub*.

### 3. Defendants' Non-Retaliatory Defense

Defendants can defeat a prima facie case of First Amendment retaliation at the summary judgment stage if they can show that no genuine issue of material fact exists to preclude the conclusion they "would have taken the same adverse employment action even in the absence of the protected conduct."  *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (internal quotation marks and citation omitted).  They must show this to be the case by a preponderance of the evidence.  *Id.*

For the same reasons discussed above with respect to the whistleblower claim, I cannot conclude as a matter of law that Nichik would have suffered the adverse personnel

actions he complains of absent any desire on the defendants' part to punish him in retaliation for his allegedly protected speech.

### C. Due Process Claims (Second and Third Causes of Action)

Nichik alleges that he was denied his constitutional rights to substantive and procedural due process when he was suspended and demoted from his managerial position at NYCTA.  Am. Compl. ¶¶ 347-357.  The Fourteenth Amendment forbids states from depriving any person of property or liberty without due process of law.  *See* U.S. Const. amend. XIV, § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law[.]")  To establish claims for violations of these rights, a plaintiff must first show that he enjoyed a protected property or liberty interests.  *See Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir. 1998).

#### 1.  Nichik's Procedural Due Process Claims

To prevail on a procedural due process claim, Nichik first must identify a property or liberty interest that is entitled to due process protection.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-39 (1985).  Second, he must show that the State has deprived him of that interest.  Third, Nichik must allege facts showing that the deprivation was effected without due process.  *Mehta v. Surles*, 905 F.2d 595, 598 (2d Cir. 1990) (*per curiam*).

I need not address whether Nichik had a protected liberty or property interest in his employment because I conclude, as a matter of law, that he was not deprived of any such interest without the process guaranteed by the United States Constitution.

The NYCTA has in place disciplinary procedures that satisfy the constitutional requirements of due process.  *Pabon v. New York City Trans. Auth.*, 703 F.Supp.2d 188, 199 (E.D.N.Y. 2010) (NYCTA's disciplinary procedures are sufficient to satisfy the constitutional

requirements of due process.).  For Nichik's 2008 and 2010 DANs, the NYCTA provided him with formal written notice of the charges against him and an opportunity to present evidence in his defense.  He received written decisions from those meetings, which specified the charges against him and detailed his account of the facts as to each charge.  Nichik was then allowed to appeal those decisions.  These procedural protections satisfy the due process requirements of the Constitution.  *Id.*

Nichik does not dispute these facts, but he alleges that he was denied an impartial decision maker because the defendants were "uniformly irritated" with him as a result of his gates report.  Pl.'s Mem. of Law at 48.  He alleges that the decision makers collaborated among each other during the disciplinary processes and did not act impartially because of their animus towards him.  Therefore, the argument concludes, as applied to him, the procedures did not provide due process.  *Id.*   But the case law precludes this argument.  *See Munafo v. Metr. Transp. Auth.*, 285 F.3d 201, 214 (2d Cir. 2002) (finding that plaintiff's claim that the hearing officers were biased against him because of his safety complaints and union activities did not present cognizable due process claims against the individual defendants.)   Due process guarantees notice and a hearing prior to the termination of a tenured public employee, *Locurto v. Safir*, 264 F.3d 154, 173 (2d Cir. 2001), but a neutral adjudicator is not a necessary component of due process at a pre-termination hearing.  *Id.* at 173-74.

Moreover, New York affords Nichik an adversarial hearing before a neutral adjudicator via an Aritcle 78 proceeding in New York State Supreme Court.  An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence.  Where a material issue of fact is raised, it allows for a trial of the disputed issue, including constitutional claims.  *Locurto*, 264 F.3d at 174.  Thus, Nichik's recourse if he believes the determinations at

his hearings were slanted by the adjudicator's bias, or that *ex parte* communications with other officials may have infected the adjudicator's ruling, is a proceeding under Article 78.  *Id.*, 264 F.3d at 175; *see also Sindone v. Kelly*, 254 Fed.Appx. 58, 59 (2d Cir. 2007).

Nichik argues that the adequacy of an Article 78 proceeding is not relevant to this inquiry because the alleged due process violation was not based on "random, unauthorized acts by state employees."  Pl.'s Mem. of Law at 50 (citing *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996)).  Nichik is correct in that the type of process that is due depends upon whether the alleged violation was caused by "established state procedures" or by "random, unauthorized acts by state employees."  *Hellenic Am. Neighborhood Action Comm.* 101 F.3d at 880.  There is no due process violation when a state employee intentionally deprives an individual of property or liberty through a random, unauthorized act "so long as the state provides a meaningful postdeprivation remedy."  *Id.*  On the other hand, when the deprivation "occurs in the more structured environment of established state procedures," rather than through random acts of state employees, "the availability of postdeprivation procedures, will not, ipso facto, satisfy due process."  *Id.*  The rationale for distinguishing between random (and unauthorized) deprivations and those resulting from established policy is that, in the former instance, the government "cannot predict when the loss will occur . . . [Therefore] it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation."  *Hudson v. Palmer,* 468 U.S. 517, 532 (1984) (internal quotation marks and citations omitted).

I need not resolve whether the alleged misconduct was "random and unauthorized."  If I were to determine that NYCTA's conduct was random and unauthorized, bringing it within *Hellenic*, the existence of a meaningful post-deprivation remedy (which New

York has provided in this case, as discussed above) would satisfy procedural due process. *See Hellenic*, 101 F.3d at 880. If, on the other hand, I were to find that NYCTA's decision was part of an established state procedure, such that the availability of a post-deprivation remedy would not automatically satisfy due process, I would go on to determine what process was due. *Locurto*, 264 F.3d at 172. This I do by balancing the following three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335 (1976).

Under the *Mathews* test, I reach the same conclusion, namely, that the process provided to Nichik was adequate. First, Nichik received a pre-deprivation hearing before being suspended and demoted. *See Cleveland Bd. of Educ.*, 470 U.S. at 545-46 (stating in the employment context that a pre-termination hearing "need not be elaborate" so long as it provides "[t]he essential requirements of due process," which are "notice and opportunity to respond"). Nichik also had access to NYCTA's multi-step managerial appeal process. The combination of these two procedures satisfied due process.

I am persuaded that the NYCTA grievance process and Article 78 appeal proceeding provide constitutionally sufficient remedies to rectify any technical or procedural errors. Accordingly, defendants' motion for summary judgment on this claim is granted.

    *2. Substantive Due Process*

Nichik also alleges violation of his substantive due process rights.  In examining whether a government rule or regulation infringes a substantive due process right, "the first step is to determine whether the asserted right is fundamental,"—i.e., "implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition." *Leebaert v. Harrington*, 332 F.3d 134, 140 (2d Cir. 2003) (internal quotation marks omitted).  Further, even deprivation of a fundamental right does not violate substantive due process unless the defendant's conduct was "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection."  *Tessler v. Paterson*, 451 F. App'x 30, 33 (2d Cir. 2011).

Nichik concedes that employment is not a fundamental right, but argues that the he has a fundamental right not to lose his career in a "humiliating and torturous manner."  Pl.'s Mem. of Law at 51.

"The Second Circuit has never articulated a fundamental interest in public employment giving rise to substantive due process protection," *see, e.g., Mathirampuzha v. Potter*, No. 8-CV-682, 2010 WL 55061 *9 (D.Conn. Jan. 4, 2010), and other courts have explicitly declared that there is no such interest.  *See, e.g., Nicholas v. Pa. State Univ.,* 227 F.3d 133, 142 (3d Cir. 2000) (joining the "great majority of courts of appeals" in holding that "tenured public employment" is not a "fundamental property interest entitled to substantive due process protection); *McKinney v. Pate,* 20 F.3d 1550, 1553, 1560 (11th Cir.1994) (en banc) (state-created property interest in employment does not give rise to substantive due process claim).  Further, NYCTA's determinations to suspend and demote Nichik do not rise to the level of "outrageously arbitrary government conduct."   For the foregoing reasons, Nichik's substantive due process claim is dismissed.

### D.  The FMLA Claim (Seventh Cause of Action)

#### 1.  Interference

The FMLA prohibits employers from interfering with their employees' ability to take FMLA leave.  *See* 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.").   Interfering with the exercise of an employee's rights includes not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.  29 C.F.R. § 825.220(b); *see Potenza v. City of N.Y.*, 365 F.3d 165, 167 (2d Cir. 2004)).   An employee may bring an interference claim against the employer when "the employer in some manner impeded the employee's exercise of [the] right[s] afforded substantive protection under the FMLA."  *Sista v. CDC Ixis N. Am.*, *Inc.*, 445 F.3d 161, 176 (2d Cir. 2006) (citing *King v. Preferred Technical Grp.*, 166 F.3d 887, 891 (7th Cir. 1999)).

To state a prima facie claim for interference under the FMLA, the plaintiff must allege: (1) he is an eligible employee; (2) the defendant qualifies as an employer under the FMLA; (3) the plaintiff was entitled to take leave under the FMLA; (4) the plaintiff gave notice to the defendant of his intention to take leave; and (5) the defendant denied the plaintiff benefits to which he was entitled under the FMLA.  *See Brown v. Pension Bds.,* 488 F.Supp. 2d 395, 408 (S.D.N.Y. 2007).

Nichik admits that his FMLA leave request was granted and he took the full amount of leave that he requested. However, upon his return he was required to present medical documentation and submit to a medical examination.  The parties dispute whether Nichik was returning from FMLA leave since he did not return to work until two weeks after the expiration of that leave.

There is no dispute that when Nichik returned to work he did not provide his employer with medical certification, and defendants requested that he submit to an "ability to perform" exam at the NYCTA's Occupation Health Service ("OHS"), as permitted by the FMLA. 29 C.F.R. § 825.312(h). This examination was "job-related and consistent with business necessity," as Nichik's position required him to supervise others and ensure a safe and clean subway station. § 825.312(h). The OHS examining doctor did not clear Nichik to return immediately to work, citing his continued use of Valium. Nichik returned to work a week later, after he brought a letter from his physician stating that he was no longer taking Valium and could return to his normal duties. Def. 56.1 ¶ 188, Pl. 56.1 ¶ 188. Nichik argues that this week out of service interfered with his FMLA. I disagree.

The defendants granted Nichik's request for FMLA in its entirety. Upon his return the defendants were entitled to request medical certification and delay restoring him to his position until it was provided. §§ 825.312(e), 825.313(d); *Drago v. Jenne*, 453 F.3d 1301, 1306-07 (11th Cir. 2006) (employer's insistence that employee take additional leave until he could provide certification from psychologist that he was fit to return to work fails to state a FMLA interference claim). Accordingly, Nichik has failed to state a prima facie case that defendants interfered with his FMLA leave.

### 2. *Retaliation*

The FMLA also prohibits employers from retaliating against their employees for taking FMLA leave. See 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."). To make out a prima facie case for FMLA retaliation, Nichik must allege that: (1) he exercised rights protected under the FMLA; (2) he was qualified

for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.  *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).  The Second Circuit recently clarified that "for purposes of the FMLA's anti-retaliation provision, a materially adverse action is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising his legal rights." *Millea v. Metro–North R.R.*, 658 F.3d 154, 164 (2d Cir. 2011) (adopting for FMLA retaliation claims the standard set forth in *Burlington N. & Sante Fe R.R. v. White*, 548 U.S. 53 (2006), which is discussed above).

At oral argument, Nichik alleged that he suffered adverse personnel action in retaliation for taking FMLA leave in that he was held out of service for two weeks after his leave was completed.  As stated above, Nichik was not allowed to return to work until he provided a note from his physician stating that he was no longer taking Valium and was able to return to work.  No reasonable juror could find this to be an adverse personnel action.  The requirement was a uniform policy, and it was permitted under the FMLA.   Indeed, an employee who does not provide a medical certification is no longer entitled to reinstatement under the FMLA and may be terminated.  §§ 825.312(e), 825.313(d).  Nichik has failed to show that he suffered any adverse employment action in retaliation for asserting his rights under the FMLA and thus has not made a prima facie case.  This claim is therefore dismissed.

E.  *Intentional Infliction of Emotion Distress*

Nichik alleges that he has suffered "punitive, extreme and outrageous" treatment causing him emotional distress.  Am. Compl. ¶ 382.  Defendants argue, *inter alia*, that Nichik has not set forth allegations of sufficient to state a claim for intentional infliction of emotion distress ("IIED").

In order to state a claim for IIED in New York, Nichik must show: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999). The New York Court of Appeals has explained that the standard for stating a valid claim is "rigorous, and difficult to satisfy" because the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Howell v. N.Y. Post Co. Inc.*, 81 N.Y.2d 115, 122 (1993) (internal quotation marks and citation omitted).

Nichik's allegation that defendants gave him reinstructions, unfavorable work assignments, a marginal MPR and disciplinary actions seeking to suspend or demote him do not, as a matter of law, constitute such extreme and outrageous conduct as to support a claim for intentional infliction of emotional distress. As a general proposition, adverse employment actions are not sufficient bases for intentional infliction claims. *See, e.g., Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1158 (2d Cir.1993) (employer's criticisms of plaintiff's job performance and conditional threats of termination fall far short of the "extreme" and "outrageous" behavior that is required for an IIED claim); *see also Walsh v. Nat'l Westminster Bancorp., Inc.,* 921 F. Supp. 168, 174 (S.D.N.Y. 1995) (IIED claim dismissed because plaintiff's allegations of being subjected to devastating retaliatory actions, including "humiliating criticism and adverse performance reviews" was not sufficiently extreme or outrageous); *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, (1983) (plaintiff was transferred and demoted for reporting fraud, told he would never advance, and then terminated in a viciously insulting manner designed to embarrass and humiliate; IIED claim dismissed). For this reason,

defendants' motion for summary judgment as to Nichik's claim of intentional infliction of emotional distress claim is granted.

### F.  The Claims Against Howard Roberts

As discussed above, Nichik reported the safety issues regarding the subway gates to defendant Roberts, who was the President of the NYCTA from April 2007 until November 2009.  Nichik alleges that Roberts "explicitly or tacitly condoned" a policy of retaliation against whistleblowers.  Am. Compl. ¶ 297.  Nichik has not alleged Roberts had personal involvement in any of the allegedly retaliatory conduct or created a policy encouraging practices of retaliation under the NTSSA, or the First or Fourteenth Amendments.  A supervisor is held liable only if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred.  Roberts's failure to get involved in resolving disputes about retaliation does not reflect his participation in the violation of Nichik's civil rights.   Accordingly, defendants' motion for summary judgment on all claims against defendant Roberts is granted.

### CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment is denied with regard to the NTSSA and free speech claims, and granted with regard to the remaining claims.

So ordered.


John Gleeson, U.S.D.J.

Dated: January 11, 2013
　　　　Brooklyn, New York

26